The next case today is Che Blake Sosa v. Massachusetts Department of Correction et al. Appeal number 20-2051. Attorney Wiesner, please introduce yourself on the record and proceed with your argument. Good morning, Your Honors. My name is Jeffrey Wiesner, and I represent the appellant Che Sosa. May I have three minutes for rebuttal? Thank you, Your Honors. The district court abused its discretion to the extent that it denied Mr. Sosa's motion for a preliminary injunction in its approval of the Department of Correction's modified restraint to restrain Mr. Sosa. The modified restraint that was approved still requires Mr. Sosa to be handcuffed behind his back, which causes Mr. Sosa significant pain. In fact, rear handcuffing, even with the modified restraint, requires corrections officers to force Mr. Sosa's severely arthritic joints beyond the limitations of their mobility each time he leaves his cell. Three experts submitted reports in this case. Two of them were on behalf of the Department of Corrections, and they unanimously concluded that Mr. Sosa simply does not have sufficient range of motion in his shoulder joints to be placed in rear restraints. Counsel, could you please clarify something factually for me? I understand the Department's take the position that in that brief span of time when your client has to be removed from his cell, that to the extent that you're arguing that the waist chains would be the best solution here in the sense that they provide all the security that the government needs and they would not require any rotation of his shoulders, the Department says that that won't work because we cannot get him out of the cell using the waist chains. We have to resort to some cuffing that will rotate his shoulders much more slightly than the single cuffs would do, but we just have no alternative to some type of cuffing procedure. As a physical proposition, do you disagree with that? In getting him out of the cell in a secure way, he does have to have some rear cuffing. Do you disagree with that? I do, Your Honor, and for two reasons. At the hearing in February of 2020, the idea and the notion at that time was that there was going to be a lengthened handcuff that was sufficiently long so that Mr. Sosa's hands would remain at his side, and he's asked for about one and a half inches more on the modified handcuff just so that his arms don't have to be rotated in a position that exceeds the limitation of his joints, and at that point he can be transitioned to waist chains. So if the cuffs were extended by two inches, his claim, he could be removed from the cell with a slightly modified cuffing procedure. Is that your point? Yes, Your Honor, and we also submitted an affidavit of a prison security expert who concluded that there's absolutely no reason something couldn't be devised to make it so he doesn't have his shoulders rotated beyond the limits of the joint. What is the injunction you're asking for? Because I understood the injunction. I may be confused. The injunction seems to be a prohibition against rear cuffing. Is that right? Yes, Your Honor. So I guess what I'm confused by is that the record seems to support the notion that rear cuffing doesn't need to be enjoined if the length of the cuffs were extended by, in one passage from your client, just an inch. Well, Your Honor, the idea would be that if the chain was long enough, his hands wouldn't have to be placed behind his back. And the whole idea, because of the… I want to ask, if it was an inch, is that not rear cuffing? Well, again, the idea in those initial hearings and what the judge initially… Just stick with me. There's testimony from your client saying one inch would make a huge difference. Yeah, I mean, the cuffs have been elongated. No, an additional inch. If they were made an additional inch, would that not be rear cuffing? Again, the notion that never occurred, and if you'll just let me finish what the procedure was supposed to be, was that… I'll give you a chance to, but just for my sake. The injunction is a prohibition against rear cuffing, correct? Right. And that's what was denied, right? Yes. If the handcuffs were extended an inch, would that constitute rear cuffing or not? I can't know that until they… Well, I guess what I'm saying then is I'm having trouble understanding how it was errored to deny the injunction. If the record supports the notion that some rear cuffing would be permissible, and it's just unclear, then you're seeking the injunction, so the record has to be clear enough to support the basis for that injunction. That's what I'm stuck on. I'm not saying that's the case. I just want you to understand what's my concern. So how do you address that part? He doesn't have sufficient mobility in his joints. So whatever the cuffs are going to be, they have to make it so that his joints don't get rotated. I think you're not grasping my point. The particular injunction that was sought was a prohibition on rear cuffing, correct? I think we're arguing semantics here. He can't have his shoulders rotated beyond a certain range. And if the chain is long enough, they won't be rotated beyond that range. That has been called rear cuffing because it forces his joints beyond their range. So is your proposition that everybody understood the phrase rear cuffing to be a reference to the type of cuffing that would involve a chain that was not extended to one inch? Yes, Your Honor. And that chain that extended one inch everybody understood would not constitute rear cuffing. Again, I can't give you the exact measurement. The procedure was to have a medical professional evaluate. How can you get an injunction? How is anyone supposed to comply with the injunction if we don't know what it would require? There was no way to do it in the trial court. The procedure is as it was. The judge did not allow what the original procedure that he ordered. If I may just finish. The procedure that was ordered in February was by the judge told the DOC get a doctor to figure out how long this restraint has to be in order to accommodate Mr. Sosa's shoulder problem. And they didn't do it. And months went by and it still wasn't done. If you look at it, it's all written out in the facts to my brief. We went for months with the DOC saying we can't get the doctor to come into the facility. Finally, they got a report and the report was he can't be handcuffed behind his back. At that point, I thought that we were going to then evaluate just how long the chain needed to be. But instead, the judge simply said, I think it's fine. The modified restraint, which was created in an arbitrary way without ever really looking at how long it needs to be to avoid the rotation of the shoulder joints, that just never happened. And so we were we were faced with an order that still required Mr. Sosa's joints to be rotated longer, rotated beyond the range of the motion of the joint. Counselor, maybe I share some of Judge Barron's confusion here. I mean, the judge made the decision that he did after hearing your client acknowledge that the modified cuffing procedure, which the Department of Corrections adopted, which is referring to as the double cuffing procedure, gave him tremendous relief. I mean, it did not eliminate the pain entirely, but by his own testimony, it was like a godsend is the way he put it. It afforded him tremendous relief. And so hearing that, the judge decided, well, it sounds like the pain issue is not completely, but it's been substantially addressed. The department says, and if we have to elongate the cuffing procedure anymore, then there's a security concern. And so the judge hearing that, he balances those two concerns, security and modifying the pain that your client has to experience. He says, well, I think this is a fair resolution, a fair accommodation. So what's wrong with that view of the situation by the judge? What is wrong with that view of the situation is, number one, it is not an overstatement to say that taking Mr. Sosa's spontaneous comment in the middle of a hearing that it is a godsend out of context. I just want to place it in context. He was being cuffed with a single chain handcuff for about 10 years that so pulled his joints beyond their range that he described it repeatedly, and it's all in the brief, as tantamount to torture. And so in that context, he said, yes, this is a huge relief. But if you continue to see what he said in that, again, it's a spontaneous comment in court, that's not enough. I just need a few more inches, and it gets exponentially worse as time goes on to have the cuffs. But the major point, and what the court did not credit, is the unanimous opinion of all three medical experts, including the DOCs, that he simply does not have range of motion to allow himself to be put into that position. And every single time he's cuffed, it forces his joints beyond their mobility. And every expert said that that is the case. And every expert said that that is painful. You've reserved three minutes. But, Joseph Hess, did you have a follow-up? Yeah. Yes, I do. Thank you. So would you please describe for me the procedure which you say eliminates all pain for him, and at the same time meets the security concerns of the department? What is that scenario that achieves those two goals, in your view, based on this record? I can give an idea of what would have worked and what I thought was going to happen, but I don't think this is the only option, and I'm not sure I'm the best person to create the options. The point is that he can't have his joints torqued beyond their range. But the procedure that would have worked is that if a medical professional had evaluated just how far the joints go, and the chain was modified and customized. I mean, the DOC went and had a custom chain made. If that was done in consultation with a physician to say, this is how long it needs to be, he could be removed from his cell with the elongated chain that doesn't put his joints in a position that takes them beyond their limits, and then he could be transitioned to waist chains. In fact, that is the procedure that was being used by the DOC in 2020. They would remove him from the cell, and they would transition him to waist chains. And that would be the end of it. We're talking about maybe, I cannot give you the inches, but it's something like one and a half inches on the side, so his arms are not put behind his back, and his shoulders aren't pushed further than their range of motion. Any further before we hear from the other side? I don't think so, Your Honor. Thank you. Attorney Wiesner, please at this time mute your audio and your video. Attorney Melville, please unmute and introduce yourself on the record to begin. Good morning. My name is Margaret Melville, and I represent the Commissioner of Correction in this case. May it please the Court. I would like to address, secondly, the waist chain issue, which is the alternative that Mr. Sosa is pushing, instead of extending the waist chains by an additional inch on each side, which would be a two-inch extension. The Lundell Shattuck Hospital orthopedic person in October of 2020 did evaluate Mr. Sosa while Mr. Sosa was in the extended handcuffs that were custom-made. And what the orthopedist said was that the extended chains allowed Mr. Sosa's hands to fall behind his, around the area of his hips in the back, to the side of his hips, but not at his side. She also discussed the degree of rotation that was required to use those extended handcuffs, which are being used while Mr. Sosa is within the housing unit at Sousa Baranowski, where he is now. And the degree of rotation required is 20 degrees of internal passive rotation. Now, Dr. Wickstead, who is Mr. Sosa's expert, said that the degree of rotation that Mr. Sosa is capable of with his condition is 30 degrees to 50 degrees of internal passive rotation. So, as an objective standard, the restraints that are being used fall within that criteria. The subjective standard is Mr. Sosa's expression of pain, and as the court pointed out, he did state that using the double handcuffs greatly alleviated the pain. But he also makes clear that he has substantial pain that he thinks one extra inch would solve. Correct. So, is there anything in the record showing that the increase of the one inch would pose a security risk? Yes. Actually, Mr. Sosa's own expert, in his report, and it appears at the record appendix at page 259, states that it's operationally reasonable to assume that inmates can rapidly move cuffs from back to front. They do that by moving them under their feet. And in the record appendix are records of incidents in which Mr. Sosa did move, in a single handcuff, over the past few years, single handcuffs from back to front. So, that is a security risk. Maybe I'm just not following if there's a gap between what your answer was and my question. Which is, with respect to the extension of it as to one inch, where is the record evidence that that one inch extension would allow for the risk you're describing? Mr. Medeiros, I don't have the record appendix cite for it, but his transcript testimony does show that Assistant Deputy Commissioner Medeiros did tell the court that there is a length at which the security risk becomes increased if you extend the chain too much. And did he identify one inch as the point at which that would be true? No, one inch is one inch on each side, so it actually is two inches. And did he identify that as the point at which the risk would be manifest? I don't have the record appendix cite before me, but yes, Mr. Medeiros stated that we've extended the chain as much as we can. Any more would create too much slack, and that would create a security risk for the department. Counsel, I understand that when Mr. Sosa is removed from the cell, that routinely there are as many as five or six guards, security officers present. They are shielded in some way. They have, I think, some kind of chemical available to subdue him if there's a problem. So I guess, obviously, they have to make a judgment what will provide the necessary security. To me, with all of that personnel present, all of those devices available, if something gets out of hand, where is the security problem if the cuffs are extended another inch when all of that personnel is present to deal with any kind of crisis? I have a little trouble understanding that. The personnel themselves, that situation has changed, Your Honor, and it was a changing situation at the time of the hearings, in this case, in the lower court, which took place over a period of a year. Mr. Sosa relies on an affidavit from Superintendent Rodriguez from 2016 to describe a move team in gear, as the court describes. By the time we were in court in 2019 going into 2020, Assistant Deputy Commissioner Medeiros explained to the court what the officers outside of the cell would be in, and he stated that it's not a move team, it's a move team, not a tactical team. It is a team of four officers and a supervisor. They're not wearing the protective gear that is described in 2016. They would wear a helmet, they would wear gloves, and they might wear a suit. But other areas of the body are vulnerable. And the reason that's important is that when you're talking about extending the chain one inch on each side, which is what we're talking about, those restraints are applied through the food slot in the door at Mr. Sosa's cell before he comes out. Four minutes remaining. When the door closes and then Mr. Sosa comes out, as his own expert states, he could rapidly move those chains from back to front and then come out swinging the extended cuffs as a weapon. Mr. Medeiros gave evidence in the lower court about all of the alternatives that we're talking about here, which is those suggested by Mr. Aiken. And those appear on the record. Videotapes were made showing what an inmate could do if he were in extended restraints or if the restraints were in the front and how he could attack the officers. So those particular officers could subdue the situation, but in doing so, they could be injured. Mr. Sosa has a history of slashing, stabbing officers when he comes out of a cell, slashing and stabbing officers through the wicket in the cell, the food slot. And if I could address the use of waist chains, which is what the other alternative is. Yes. That Mr. Sosa... Before you switch to waist chains, does the PESA do you have another question about before we get to waist chains? I didn't ask about waist chains. I was going to ask about waist chains. I just wanted to make sure I understand something. Yeah. As I understand the injunction, it's a prohibition against rear cuffing. The specific language is a prohibition against using the traditional single cuffs behind the back for rear cuffing. Okay. And so if you did extend it an inch, do you understand if the injunction were in place and in response you extended an inch on each side, would you then understand yourself to be in compliance with the injunction? Do you follow the question? No. I'm sorry. Okay. The injunction uses certain words. It doesn't refer to length of chain. Correct. It says traditional handcuffs. So if the injunction were issued, if you then responded by increasing the length of the chain one inch on each side, would your understanding be you would then be in compliance with that injunction? Yes, because that is not a traditional handcuff. Okay. So in that sense, what the injunction is is prohibiting – would prohibit you from continuing cuffs of this length. You might have – even if extending it an inch on each side wouldn't be waist chains or something like that, right? Correct, but there's a second part of the injunction. So your position is that you should not be required to increase it even an inch on each side and that the record supports the conclusion that you should not be required to do so because of the balance between what the record shows as to harm to him in the objective sense and security risk that would follow. Is that the idea? Correct. You're not disputing that the record supports, at least in a subjective sense, his contention that there's still significant pain at this length? No. And it's your position that he's not entitled to a pain-free solution. I gather that must be your position, right? Only because of the security risk that he presents in the mandate of harm. Do you have anything that could help us think through? Because, I mean, you can see that obviously there's a security risk on the one hand, but there's a certain level of pain that a person can't be made to endure for the sake of security. I mean, that would seem that just can't be the case that you can subject somebody to intensive pain as a way of dealing with the security problem. So how are we supposed to think through the drawing of that line if the record supports the idea of pain? Are we supposed to discount it because it's just a subjective claim? I mean, is there some authority that would help us think through that? No. The issue is not subjective pain. The issue is whether the department has a reasonable basis for viewing, with some skepticism, the level of pain that Mr. Sosa is expressing. And there is record support for that. I apologize again. I thought I had a record appendix. Did the district court rely on that in making its ruling? The district court did discuss the difference between subjective measure of pain and testing Mr. Sosa's veracity as to his expression of pain in the first hearing at the outset. And then as that is why he ordered an independent medical evaluation. I contest the assertion that all of the doctors who examined Mr. Sosa in the course of this litigation agreed that he should never be cuffed behind his back. The Lemel Shattuck Hospital orthopedist did not say that. She said it would cause discomfort and that Mr. Sosa expressed that he was receiving pain. We accept that. The Dr. Elman, who was the independent evaluator at the outset, who came in in 2019 and issued the initial report, stated Mr. Sosa expresses that he's experiencing pain. And it would be understandable given his condition for the shoulder condition. I thought it was mostly in the right shoulder. But then again, you then go to the objectives. And then with respect to the expression of pain, the record supports, including Mr. Aiken's opinion, that inmates can do this. That they were always looking for an operational way to get around security. So there's that part of the subjective part based upon and then weighed against the objective analysis of the 20 degrees of rotation that is required. Judge Howard, you had a question? If I could just ask one question, hopefully brief. Can you tell me, counsel, what your view is of the actual status of the legal status of the double cuffing or extended chain use at this point? We have, I think, we have a denial of a preliminary injunction. And then we have the DOC using this new process. But I didn't find, for PLRA purposes, I did not find that the district court found any likelihood of success under the Eighth Amendment or the ADA. My question really is, is there an enforceable order in place against the DOC from your perspective? And if not, what is your view of the legal status of the case? Yes, the order in the court that issued after all of the hearings appears at Record Appendix 278. And the court not only denied the, well, issued and told the department it can't use standard handcuffs, which is the single handcuffs. But did it first make a determination about the likelihood of success on the ADA or Eighth Amendment claims as required by the PLRA in order for it to be enforceable against DOC? And if it didn't make those findings, are you conceding nevertheless that it's enforceable? The court in its order did not make a specific finding on success on the merits, but did discuss the applicable, the required standards under both the Eighth Amendment and under the ADA. And balance the contrasting needs under Cameron in COSL. And with respect to the court order, it then said, continue to use the extended cuff, which makes, which lets Mr. Sosa's hands fall to the rear of his hips. Because that also provides security that we need for the staffing at the institutions, as well as leaving, aiding as much as possible, any unnecessary pain under the Eighth Amendment. Is it your view that the preliminary injunction issue is now moot? No, and I'll explain why. Mr. Sosa's situation has now changed. He is no longer at Cedar Junction, which was a situation when the order issued. But, he is in a restrictive housing unit at the Sosa-Baranowski Correctional Center, which is our maximum security prison. He is inside of a unit in which he rarely leaves the unit, but he is receiving medical treatment for his shoulder. He is receiving medical treatment for his, mental health treatment for his antisocial personality disorder. With the goal of trying to reduce the security need for the institution. He is being cuffed with the extended cuff that was manufactured, and the court ordered us to continue to use in order to reduce any pain to his shoulder when using it. And it's only used within that unit, and at most for brief periods of time when he's moving within that unit. Waist chains are used anytime he's going to be leaving that unit, or anytime that he is going to be leaving the institution. And the security risk with using the waist chains is that it's the transition out of the extended cuffs into the waist chains, in which time Mr. Sosa is no longer cuffed. And that's why the waist chains are not used within the unit, because anytime he's moved within the unit, he has to be transitioned and is not cuffed at all. Four times between cell A and cell B. Say cell B is a shower. And Mr. Medeiros discussed that. This all suggests to me that the appeal that we have in front of us is moot. We would accept the ruling that the appeal is moot because we are using the extended chains, and we'll continue to do so. What is the status of the request? This is where I'm just not following something. The injunction that was sought and denied, that's being appealed from, my understanding of what you had said to me earlier is that you understood that injunction, if it had been granted, would have required at least the extension of the cuffs of one inch on each side, right? No. I think it would be that we would have to find another alternative to using single handcuffs. Right, but you said that you would be in compliance with that injunction if issued, if you extended it one inch on each side. I believe we would, yes. Yes, so that's what I'm saying. At least, that injunction at least would require you to extend on one inch on each side because then you'd be in compliance with it, correct? Correct, which is less than what we are doing. That's the piece then that's not moot, right? That would be correct. The denial of that injunction amounted to a denial of the request for you to at least extend the chains one inch on each side. If that is how the court interprets what the notice of appeal from the plaintiff is requesting. Do you not interpret it that way? I had thought that he was appealing also from the order that we continue to use extended handcuffs that we are using. In the absence of an order to extend it even further, ought to always use waist chains every time he came out of his cell. Well, when you say also, that suggests that one of the things he was appealing is what I just described. And if that's true, then at least that part of it's not moot. Are you saying that he only appealed other things than I described? That was how I read his brief, correct. So, in your view, you understand him to appealing what? Everything that the court ordered in its written order on recommending... But one of the things he ordered was a denial of the requested injunction. And the injunction that's denied is an injunction that you're conceding today would require you to do more than you're doing. So, how could it be moot? It would require us to do less than what we're doing. What? Well, I'm sorry, require you to do more in his favor than you're doing. A couple of points, if I might. The district court, I think there's some confusion here about what double cuffing means and what it means to extend it another inch. My understanding is the court said that I would issue an injunction requiring the department to continue to use the double cuffing procedure. The procedure that he said gave him great relief. The court chose not to do that because the department said, well, we pledged to do that. And so the court took the position, I'm not going to order you to do something that you say you're already going to do. His position is, that's still not enough. I need another inch on each side. If I get that, then I'll get complete relief. The court was not prepared to go that far. That's my understanding. My factual question is that since everybody seems to agree that the waist chain procedure avoids any pain for him, provides all the security that the department needs. Why, and clearly, there's always going to be a transition between the double cuffing and the waist chain procedure. When he goes out of the unit, there's got to be a moment when the double cuffs are removed and the waist chains are used. So, since that has to be done anyhow, and I think this is his position in part. When he comes out of that cell, except the proposition that he's got to be double cuffed for security reasons when he comes out of the cell. Why can't the department immediately use the waist chain procedure, which eliminates all pain and provides the necessary security? The department seems to say, we could do that, but it's inconvenient. I mean, he only has to go 20 feet to get to the showers. So, why should we go through that procedure when he only has to go 20 feet? That may be true, but if your only argument against that is it's inconvenient for us to do that, that doesn't seem to me a very compelling argument. When he says, I'm in a lot of pain all the time that I have my hands behind my back. Other than inconvenience, what prevents the department from immediately going to the waist chain procedure once he gets out of the cell? You have to do that anyhow, you've acknowledged that. Why can't it be done then? You have to do it when he goes out of the unit. Why can't it be done within the unit? Because he rarely goes out of the unit, Your Honor. And if I could just step back for a minute. First, the question of double cuffing. Double cuffing isn't a security measure. If I could just explain, we are using extended handcuffs that equal what two cuffs linked together would approximate in order to extend the shoulder blade. We started doing that as soon as we got the report from Dr. Elman, the independent evaluator, that there was too much stretching in the muscles of the shoulder. So the double cuffing to extend the length behind the back to further closer to the hips was only an interim procedure until we could manufacture extended cuffs to let that be a permanent solution so that we could use those extended cuffs instead of using two handcuffs linked together all the time. So it's not a double cuffing procedure, it's extended cuffs. And if I could explain, what the court has just quoted was something I argued. What I argued is not evidence. I've got to rely on what Assistant Deputy Commissioner Medeiros stated to the court. And Mr. Medeiros explained this at Record Appendix 416 to 417. We do not transition into waist chains unless an inmate is going outside the unit further distances such as going to court or whatever, hospitals. That's a safety issue for us because we don't like the transition in restraints. And we don't like to do it that often because the officers doing the transition become vulnerable once the handcuffs come off of the inmate and before the waist chains go in. And that would have to be done secondarily. Let me explain just how that would occur. If we were to do that, every time Mr. Sosa comes out of his cell, which could happen multiple times during the week, as opposed to the rare occasion when he's leaving the unit. He's in a restrictive housing unit. So he only leaves that unit if he's going to be going outside the facility or to the hospital unit at Susa Vernowski. So everything occurs within the housing unit. The extended chains are applied behind his back through the food slot in the cell door. Then he steps out. At that point, the handcuffs have to be taken off Mr. Sosa in order to put on the handcuffs that are attached to the waist chain. So at that point, Mr. Sosa is no longer restrained. And as Mr. Medeiros explained, that's when the officers are vulnerable to being attacked. Whether they're in gear or not, their necks are exposed, their backs are exposed. Any physical assault by Mr. Sosa can injure those officers, even if they can't quell it. That would have to be done four times for a movement within the unit because he would have to be taken out of the waist chains, placed back into the double cuff. So there's another transition before he goes into point B, which could be a shower cell. And at that point, then taken out.  That would happen multiple times a week, placing officers at risk multiple times almost every day. Every three days for a shower, going for mental health therapy. So that is why the risk is different for a movement within the unit. And I also point out that Mr. Sosa has stated multiple times in the record that he can endure the extended handcuffs for a few minutes or a short period of time. That's what's occurring within the unit because the record is that the longest time that he would be in the extended handcuffs at the time of the hearing was eight minutes to go from point A to point B. He is now at Sosa-Bandowski and it's four minutes from point A to point B. Any further questions for Counselor Melville? That's very helpful, Counselor. Thank you. Thank you. If the court has no questions, I will rest of my brief. Thank you. Thank you. Thank you, Attorney Melville. Please mute your audio and video at this time. And Attorney Wiesner, you have a three minute rebuttal. Please reintroduce yourself on the record to begin. Jeffrey Wiesner for Chase Sosa. Just very quickly, a couple of points. I submitted a motion to supplement the record with an affidavit for Mr. Sosa indicating that the security protocol, a heightened one, that the DOC has employed to use to take Mr. Sosa out of his cell has been dramatically lessened since his move to Sousa-Bandowski. So I would say that the concomitant to that is that the DOC views him as much less dangerous than they did at the time that they were using the Fog Man team. And I would also just say that the notion that the pain is subjective here is not quite right. I have to disagree with DOC counsel concerning the absolutely unequivocal conclusion of all the medical people, and it's right in the report. They all say he does not have sufficient range of motion in his joints to be handcuffed behind his back. So it's fully corroborated by objective findings of physicians that the joints simply don't go far enough for the handcuffing that is now taking place at the DOC. Thank you, Your Honors. If there are no other questions, I close those two points. Could you just spend a minute on the mootness question? Just explain to us what is, in your view, live about this appeal in light of all that's happened below? Well, I think that Judge Lippert stated it correctly. He is still being handcuffed in a way that we say causes him pain and maneuvers his joints beyond their limitations. I frankly don't understand exactly why the issue would be moot at this point if he's still suffering the deprivation that we claim he is suffering, which is… Well, the answer to that is that the complaint for preliminary injunction alleges that the single cuffing knuckle-to-knuckle is what the violation is. That's all, but we're fine. Well, I did file another motion for preliminary injunction that the judge accepted and dispensed with the initial motion for preliminary injunction. I think it was in March where the judge says he's going to take that as the operative preliminary injunction motion, which says that he should not be handcuffed using the double cuffs unless he's transitioned to waist chains. That is the motion that the judge ultimately ruled upon. Can I just understand, in how does the intervening decision to provide the non-double cuffed extended cuffs relate to that request? In other words, you said he shouldn't be double cuffed, he should go to waist chains, and then in the interim, they've now shifted him to custom lengthened cuffs that are not double cuffs but also are not waist chains. How does that impact what the state of the appeal is? There's no practical difference between the double cuff and the modified restraint. They're exactly the same length, and that is the basis upon which the DOC had those handcuffs created. So it's the same length of chain that's the relevant… …the likelihood of success on the merits with respect to that under the ADA or the Eighth Amendment as the PLRA requires in order for it to be enforceable against the agency. I would agree with that.  Your Honor, there was no analysis in his opinion. It obliquely refers to a reasonable modification and accepts the judgment, frankly, the singular judgment of the DOC that this is sufficient to rectify… But you don't understand. Your understanding is that the DOC has accepted that as a valid order? They're doing it. That is all I can say about that. They are using the modified restraint. If I dropped out of the picture, could they go back to doing… What is the significance in your view of the fact that the order has that potential flaw from a PLRA perspective to this appeal? I'm not sure I can answer that question, Your Honor. I don't know the answer to that question. Did you have a view on it, even if you don't know the answer? I mean, the judge did what he did. It's been… You have no problem with us treating that as a valid order in the absence of DOT contesting its validity, right? I don't have any objections. And even if we so treat it, your appeal is still live because that order doesn't provide you all the relief that you requested from the district court. Correct. Okay. Thanks. Thank you. I have nothing further. Thank you, Your Honor. That concludes argument in this case. Attorney Wiesner and Attorney Melville, you should disconnect from the hearing at this time.